ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Friday, April 6, 2018 10:55:25 AM
CASE NUMBER: 2018 CV 01546 Docket ID: 32052116
RUSSELL M JOSEPH
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | |
|---|---|
| **DONALD PYLES**<br>2017 Speice Ave<br>Dayton, OH 45403,<br><br>- and -<br><br>**SUSAN SCHROEDER**<br>1806 Fauver Ave<br>Dayton, OH 45420,<br><br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>**NICOR ENERGY SERVICES<br>COMPANY ,**<br>1844 Ferry Road,<br>Naperville, IL 60563<br><br>        Defendant. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>No. |

## CLASS ACTION COMPLAINT

Plaintiffs, Donald Pyles and Susan Schroeder, by counsel, on behalf of themselves and all others similarly situated, allege as follows:

### NATURE OF THIS ACTION

1.     This is a class action against Defendant Nicor Energy Services Company ("Nicor") for slipping charges onto public utility customers' bills for worthless gas line or

surge protection plans and for violating Ohio laws designed to protect its citizens from deceptive telephone solicitations and companies pretending to be public utilities.

2.     When an Ohio Vectren Energy utility customer calls the phone number provided by the utility to transfer utility service, the customer is, by design, routed to Defendant Nicor, a private, unregulated, unidentified Illinois company that, after completing utility transfer requests for Vectren Energy, sells expensive and unused protection plans in a manner that deceives the customer into thinking that it is a utility charge or service.

3.     Defendant Nicor then bills that utility customer for "Non Vectren Energy Delivery Charges"—or "Third Party Products and Service Charges" after a lawsuit was brought against it in Indiana—on the customers' monthly Vectren Energy utility bill without disclosing Nicor's identity, which has tricked thousands of Ohio utility customers who are surprised to later find out (if they ever find out at all) that Nicor has scammed them through their utility bill.

4.     A week or two after the telephone scam, a third-party company that works for Nicor mails the customer a boiler plate arbitration agreement, in an effort to prevent the customer from bringing a class action lawsuit against Nicor for its deceptive conduct. However, the United States District Court for the Southern District of Indiana recently denied Nicor's motion to compel arbitration in a similar class action in Indiana because Nicor never obtains the customer's consent to the arbitration agreement and no consideration was provided by Nicor for these additional terms. *See Plummer v. Nicor Energy Servs. Co.*, No. 1:17-cv-02177-WTL-MPB, 2018 WL 1156281 (S.D. Ind. Mar. 5, 2018).

## PARTIES

5.      Plaintiff Donald Pyles is a citizen of Montgomery County, Ohio.

6.      Plaintiff Susan Schroeder is a citizen of Montgomery County, Ohio.

7.      Defendant Nicor Energy Services Company ("Nicor") is a Delaware corporation with its principal place of business in Naperville, Illinois. Nicor is thus a citizen of Delaware and Illinois. Nicor operates in Ohio under the trade name of Vectren Home Solutions, Vectren Services, Pivotal Home Solutions, Nicor Services, Nicor National, Advanced Solutions of Ohio, Service Protection Group, and Columbia Retail Services.

## JURISDICTION & PREFERRED VENUE

8.      This Court has personal jurisdiction over Nicor because: (1) Nicor has systematic and continuous contacts within this State because it systematically and continuously collects money from citizens in this State, and/or a utility in this State, and communicates via telephone, mail, and the internet with persons in this State in furtherance of its activities; and (2) Nicor consummated the transactions at issue in this case within this State thereby purposefully availing itself of the privilege of conducting business within this State, and Plaintiffs' and Class members' claims arise out of Nicor's in-State activities.

9.      This Court has subject matter jurisdiction under R.C. § 2305.01 because the claims all arise under Ohio law, including statutory claims under the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq.*, the Ohio Telephone Solicitation Sales Act, R.C. § 4719.01 *et seq*, the Ohio Deceptive Sales Practices Act, R.C. § 4165.01 *et seq.*, and Ohio common law, and Plaintiffs' claims exceed $15,000, exclusive of costs.

10.    Venue is proper in this County because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in Montgomery County, Ohio.

## NICOR'S SCHEME TO SCAM PUBLIC UTILITY CUSTOMERS

11.    Nicor purports to provide repair products and services such as outside water and sewer and gas line protection plans.

12.    Nicor's plans are not insurance, but are essentially valueless repair plans that consumers would not knowingly purchase because these plans are unnecessary, expensive, and provide very little coverage, if any at all. (*See, e.g.,* Investopedia, *15 Insurance Policies You Don't Need*, http://www.investopedia.com /articles/pf/07/ (last visited May 5, 2017) ("the odds are in your favor that you will never use this coverage . . . [and] the likelihood of a problem is low and repair costs are a few thousand dollars or less").)

13.    Consumer Reports criticizes these utility repair plans as worthless: "**Bottom line.** Putting money in a fund for a rainy (or leaky) day is smarter than paying $100 a year for potential service" because a "standard homeowners insurance policy generally covers repairs to a property's water- and gas-service lines if damage is accidental, as with an excavation mishap . . . ." (*Think twice before buying a repair plan from companies such as HomeServe, Nicor Services, and others*, Consumer Reports, May 2012,                              http://www.consumerreports.org/cro/magazine/ 2012/04/think-twice-before-buying-a-repair-plan-from-companies-such-as-homeserve- nicor-services-and-others/index.htm.)

14.    The Illinois Attorney General criticized Nicor's scam product because:

4

> although the plan cost about $60 a year, most gas-leak repairs cost less
> than $50 for consumers without the plan. "Given the facts," says Robyn
> Ziegler, a spokesperson for the Illinois attorney general, "ComfortGuard
> is not a necessary product or a good value."

(*Id.*) The Illinois Attorney General is currently investigating consumer complaints about Nicor's charges on Illinois utility bills. (L. Parker & R. Green, *Sneaky Fees Making Some Nicor Gas Customers Furious*, https://www.nbcchicago.com/news/local/Sneaky-Fees-Making-Some-Nicor-Gas-Customers-Furious-456266463.html, Nov. 8, 2017.)

15.     To make matters even worse, Nicor charges renters (not just homeowners) for these plans on their monthly utility bills. Because renters do not own the lines on the property that they rent, Nicor's plans provide no benefit at all for renters.

16.     To deceive customers into purchasing this worthless but expensive protection plan, and to avoid having to directly sell it to customers that wouldn't knowingly buy it, Nicor enters into relationships with public utilities that provide essential services to consumers, such as gas, electricity, and water. Under this arrangement, Nicor is able to sneak its charges onto the utility's monthly bills.

17.     Nicor pays the public utility a 10 to 15% kickback from Nicor's revenues if the public utility (1) provides Nicor with access to all the names and contact information of the utility's customers, (2) allows Nicor the use of the public utility's trade names, logos, service marks, and trademarks, and (3) allows Nicor access to the public utility's marketing channels.

18.     The public utility also allows Nicor's charges to appear on the public utility's bill, so that the consumer unknowingly pays a single lump sum to the public utility, only a portion of which actually goes to the public utility for the essential service

of gas, water, or electricity. The portion of the utility bill that is actually charged for Nicor's valueless repair plan is passed onto Nicor, after the public utility takes a 10 to 15% cut.

19.     The purpose of Nicor's deal with public utilities is clear—consumers would not buy Nicor's worthless plans without being tricked into thinking that the Nicor plans are actually public utility charges for the essential services of gas, water, or electricity, or plans provided and mandated by the public utilities.

20.     A Nicor insider called Nicor's practices "predatory," "unethical and lucrative, bringing in millions of dollars to the company." (L. Parker & R. Green, *Sneaky Fees Making Some Nicor Gas Customers Furious*, https://www.nbcchicago.com/news/local/Sneaky-Fees-Making-Some-Nicor-Gas-Customers-Furious-456266463.html, Nov. 8, 2017.)

21.     Nicor, and similar other companies, have been sanctioned for this practice. The Illinois Commerce Commission ordered Nicor Gas, a utility, to stop promoting Gas Line ComfortGuard, a pipe-repair plan offered by its unregulated affiliate Nicor, to customers who called the utility. The commission said the utility failed to provide pertinent information, and the Illinois Attorney General said that the repair plan "is not a necessary product or a good value." (Consumer Reports, *supra.*)

22.     The Massachusetts Attorney General asserted that HomeServe, a company like Nicor, had offers of contracts to repair electric and gas lines and equipment that looked too much like utility bills and misled consumers about repair costs and who was responsible for repairs. (Consumer Reports, *supra.*) HomeServe paid $75,000 as part of a

settlement agreement with the Attorney General and agreed to disclose clearly in future promotions that its services are optional and not from a utility. (*Id.*)

23.     HomeServe also previously agreed to change its mailings in Kentucky and Ohio after Attorneys general in those states found that the company suggested its service was a mandatory utility fee. (*Id.*) The company also paid fines in Kentucky and Ohio. (*Id.*)

## NICOR'S RELATIONSHIP WITH VECTREN OHIO

24.     Vectren Energy Delivery of Ohio, Inc. ("Vectren") serves 316,000 natural gas customers in a 17-county region in Ohio.



25.     Vectren is a public utility regulated by the Public Utilities Commission of Ohio ("PUCO"), but the PUCO does not regulate Nicor or the Nicor charges that appear on consumers' Vectren utility bills.

26.     At some point Vectren entered into a relationship with Nicor that allows Nicor to charge Vectren customers for Nicor charges on Vectren bills. The charges appear on the Vectren regular billing statements as follows:





27.     The bill is a monthly utility billing statement and contains Vectren's logo and colors. Nicor's name appears nowhere on the bills.

28.     Under "Your Account Information," at the top of the bill, the charges are broken into two categories: "Vectren Delivery and Supply Charges" and "Non Vectren Energy Delivery Charges." Both of those charges are then combined into a total "Charges This Period" category.

29.     After Nicor was sued for these charges in Indiana, the "Non Vectren Energy Delivery Charges" were changed to "Third Party Products and Services Charges."

8

30.     The design of these charges is intentional by Nicor—the consumer is not told that the charges are Nicor charges or that the charges are for a protection plan that has nothing to do with the utility's approved rates and charges. What the charges are actually for and who is receiving the funds is not disclosed anywhere on the bill.

31.     Instead, Nicor vaguely categorizes its charges, which intentionally masks and fails to disclose what the charges are actually for.

32.     At the very bottom of the bill, under "Non Vectren Energy Delivery Charges" or later, "Third Party Products and Services," is "Vectren Home Solutions Charges" along with a phone number for "Vectren Home Solutions Contact." Again, the bill leads consumers to believe that the charges are from Vectren by the repeated use of Vectren's name on a Vectren utility bill and that the charges are coming from a publicly-regulated entity.

33.     The bill fails to name Nicor, fails to disclose that the charges are from a non-PUCO-regulated entity named Nicor Energy Services Company from Naperville, IL, fails to disclose what service or repair plan Nicor's charges are for, and fails to disclose that 85-90% of the "Non Vectren Energy Delivery Charges" paid to Vectren will be funneled to Nicor.

34.     The Vectren bill defines in detail each type of regulated charge that Vectren charges the consumers; however, conspicuously missing is any reference to or definition of the Nicor charges.

35.     A public utility in Indiana allowed the same type of charges to appear on its bill with a company other than Nicor. The Indiana Regulatory Commission did not,

and could not, order the third-party company to refund the improper charges, but it did

find the following:

> The [Indiana Office of Utility Consumer Counselor ("OUCC")] expressed concern that [the third-party service] is being offered to [the public utility's] customers in a way that indicates the product is being sold or administrated by [the public utility]. . . .

> Accordingly, we agree that [the public utility] . . . shall no longer offer [the third-party company] marketing and promotional materials to customers that contain [the public utility's] logo or utilize [the public utility's] letterhead, and all [third-party] materials that are offered must clearly indicate that the [third-party] product is not a product of [the public utility] but a product of the [third-party], which is not a [public utility] company.

36.    Numerous Vectren customers have complained online about the Nicor

scam:

- "[Nicor] honestly think[s] renters are liable for their apartment's lines. . . ."

- "This just happened to my fiance and I. Got our Vectren bill and have a $100 charge under non-vectren charges all of a sudden on this months bill. Not only did we not know we signed up, they claimed that their service has been down for the last 7 months since we moved in so we got charged for the services in a lump sum on one bill."

- "I apparently am roped into the same scam."

- "I own a small apartment and my typical bill runs $15-20 on average, the non Vectren charges bumped it up to double that. Contacted Vectren and they indeed said it was due to extra insurance costs. . . . [I] am shocked about this partnership between [V]ectren gas and [V]ectren home solutions to automatically apply this insurance policy without the consent of the home owners. This is unlawful and is reminiscent of the Wells Fargo debacle."

- "I just moved into a house 2 weeks ago . . . . I transferred utility services from my apartment to my new house, which luckily were the same companies (Vectren and Duke Energy). . . . Well, less than a week after we bought the house, and before we even moved in, I got something in the mail from Vectren Home Solutions, welcoming us to our new home, thanking us for buying their service plans, and that "for my convenience"

the amount due for those services would be billed to my Vectren Energy billing statement monthly in the amount of $18.80.  WHAT??  Then below it lists all plans enrolled; gas line protection (it is listed twice), electric line protection, surge protection plan 2K, and media line protection.  . . . ."

- "I just noticed this month that when my gas charge [ ] for one month is $87.64 . . . . I had not seen your video so I gave them a call because I was curious to what those charges are for. They told me that they are going to call me back in 2 business day and tell me where those charges come from. I have used their services for 2 years. . . . I remember receiving a letter from them encouraging me to get insurance in case pipes leak etc[.] but I never signed for anything."

- "Pivotal [Home Solutions] just hit us with this for the 3rd time. . . . In fact, they tried to get me to agree to charges which I refused to do.  They also tried to tell me that the "insurance" started 9 months before we established the service."

37.     Nearly 200 similar complaints are lodged against Pivotal Home Solutions, another d/b/a of Nicor, on the Better Business Bureau's website, www.bbb.org.

**NICOR'S TELEPHONE SCAM**

38.     Nicor has an agreement with Vectren Energy to take transfers of Vectren Energy utility service calls.

39.     Nicor employs around 200 call center agents at its headquarters in Naperville, Illinois. Those call center agents were trained by Vectren.

40.     When a Vectren utility customer calls what they think is Vectren to transfer utility service from one location to another, the call is routed to Nicor's call center agents in Naperville, Illinois.

41.     Nicor has agreements with utility companies in 18 different states to implement the same scam they are implementing in Ohio, and calls for all those utility companies are routed to the call center in Naperville, Illinois.

42. Working from a standardized script that the call center agents are trained on, and are disciplined for the slightest deviation from, the call center agent answers the call and does not identify that he is employed by Nicor or that he is not a Vectren employee or that he is located in Illinois.

43. The Nicor call center agent uses Vectren Energy's system to complete the utility service transfer request, which can take as much as 20 minutes, and then transitions to tricking the consumer into "agreeing" to allow Nicor to charge the customer for Nicor's "protection plans" on the Vectren utility bill.

44. At this point in the call, the Nicor call center agent, by design and through training reviewed by the Quality Assurance department, begins to speak at a very rapid pace, which is markedly different than the pace and tone taken during the utility service transfer request portion of the call.

45. During the second half of the call when the customer is being duped, they are also provided their Vectren Energy account number, which further conflates the utility service charges with Nicor's charges.

46. There are no restrictions on the type of customer that the Nicor call center agents will dupe, and it does not matter whether the customer has a need for the product (or if any customer could ever have a need for the product).

47. A week or two after the transfer of utility service charge, Nicor, using the services of a third party, claims to mail a welcome package to the utility customer that includes a boilerplate arbitration clause. Arbitration is never discussed on the phone with the utility customer.

48. The duped utility customer has no reason to expect a mailing from Nicor or from Nicor's d/b/a of Pivotal Home Solutions.

49. Vectren utility customers are not told how to cancel Nicor's service and Nicor doesn't even provide a specific number to call to cancel. The only 800 number on the welcome letter purportedly sent to customers is for scheduling service.

50. The United States District Court for the Southern District of Indiana recently denied Nicor's motion to compel arbitration in a similar class action in Indiana because Nicor never obtains the customer's consent to the arbitration agreement and no consideration was provided by Nicor for these additional terms. *See Plummer v. Nicor Energy Servs. Co.*, No. 1:17-cv-02177-WTL-MPB, 2018 WL 1156281 (S.D. Ind. Mar. 5, 2018).

## PLAINTIFFS' ALLEGATIONS

**Plaintiff Donald Pyles**

51. Plaintiff Pyles has resided at his current residence for approximately 10 years. Before that, he lived in an apartment and possibly called Vectren to set up his utility service when he moved nearly 10 years ago.

52. In November 2017, Plaintiff Pyles discovered the "Third Party Products and Services Charges" for $9.90 on his bill.

53. Prior to November 2017, the charges appeared as "Non Vectren Energy Delivery Charges" for $9.90 on his bill.

54. Plaintiff Pyles called Vectren to ask about the "Non Vectren Energy Delivery Charges" and "Third Party Products and Services Charges" and was told to call

1-800-536-6140, the "Vectren Home Solutions Charges" telephone number provided on the second page of his bill.

55.     Plaintiff Pyles called that number and explained that he never authorized these charges and asked for evidence of his authorization, but none was provided. A refund of the charges was also refused.

56.     Plaintiff Pyles never used the purported protection plan Nicor deceived him into paying on his Vectren utility bill.

57.     Plaintiff Pyles does not recall receiving any terms and conditions or other purported contract or agreement relating to any Vectren Home Solutions service.

58.     Plaintiff Pyles paid Vectren for the Nicor charges because he was deceived by Nicor to believe that he was paying Vectren utility charges. Other Vectren utility customers paid Nicor for "Non Vectren Energy Delivery Charges" or "Third Party Products and Services" charges because they were also deceived by Nicor to believe that they were paying Vectren utility charges.

**Plaintiff Susan Schroeder**

59.     In late 2009, Plaintiff Schroeder moved into a rental home in Dayton, Ohio.

60.     At that time, Plaintiff Schroeder called what she believed to be Vectren to set up her public utility service.

61.     In March 2018, Plaintiff Schroeder discovered the "Third Party Products and Services Charges" for $9.90 on her bill.

62.     Prior to March 2018, the charges appeared as "Non Vectren Energy Delivery Charges" for $9.90 on her bill.

63.     Plaintiff Schroeder called Vectren to ask about the "Non Vectren Energy Delivery Charges" and "Third Party Products and Services Charges" and was told to call 1-800-536-6140, the "Vectren Home Solutions Charges" telephone number provided on the second page of her bill.

64.     Plaintiff Schroeder called that number and, after being on hold for nearly thirty minutes, explained that she never authorized these charges.

65.     Plaintiff Schroeder is renting her home so she would not, and could not, use the purported protection plan Nicor deceived her into paying on her Vectren utility bill.

66.     Plaintiff Schroeder does not recall receiving any terms and conditions or other purported contract or agreement relating to any Vectren Home Solutions service.

67.     Plaintiff Schroeder paid Vectren for the Nicor charges because she was deceived by Nicor to believe that she was paying Vectren utility charges. Other Vectren utility customers paid Nicor for "Non Vectren Energy Delivery Charges" or "Third Party Products and Services" charges because they were also deceived by Nicor to believe that they were paying Vectren utility charges.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and as a class action on behalf of the following proposed class (the "Class"):

> All persons in the State of Ohio who were billed for a "Non Vectren Energy Delivery" charge or a "Third Party Products and Services" charge on their Vectren utility bill.

69.     Plaintiff Schroeder also brings this action on behalf of the following subclass (the "Renters Subclass")"

All persons in the State of Ohio who were billed for a "Non Vectren Energy Delivery" charge or a "Third Party Products and Services" charge on their Vectren utility bill and who were renting the property to which that bill corresponded.

70. This action is properly maintainable as a class action under Ohio Rules of Civil Procedure 23(A), (B)(2) and (B)(3).

71. The Class and Renters Subclass each consist of thousands or more persons, such that joinder of all Class and Renters Subclass members is impracticable.

72. There are questions of law and fact that are common to the Class and Renters Subclass members that relate to Nicor's deceptive conduct.

73. The claims of the Plaintiffs are typical of the claims of the proposed Class and Renters Subclass because they are based on the same legal theories, and (a) Plaintiffs have no interests that are antagonistic to the interests of the Class members; and (b) Plaintiff Schroeder has no interest antagonistic to the interests of the Renters Subclass.

74. The Plaintiffs are adequate representatives of the Class and Plaintiff Schroeder is an adequate representative of the Renters Subclass and have retained competent legal counsel experienced in class actions and complex litigation.

75. The questions of law and fact common to the Class predominate over any questions affecting only individual Class members, particularly because the focus of the litigation will be on the conduct of Nicor and its standardized deceptive conduct. The predominant questions of law and fact in this litigation include, but are not limited to, whether Nicor's conduct violated the Ohio Consumer Sales Practices Act, the Ohio Telephone Solicitation Sales Act, and the Ohio Deceptive Trade Practices Act; whether Nicor was unjustly enriched; and the type of relief to which the Plaintiffs and Class members are entitled.

76.     Similarly, the questions of law and fact common to the Renters Subclass predominate over questions affecting only Renters Subclass members, particularly because the focus of the litigation will be on the conduct of Nicor and its standardized deceptive conduct.  The predominant questions of law and fact in this litigation relative to the Renters Subclass include, but are not limited to, whether Nicor's plans are functionally useless, illusory, and/or unconscionable relative to Renters Subclass members, and the type of relief to which Plaintiff Schroeder and Subclass Members are entitled.

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual Class members or Renters Subclass members, and certification as a class action will preserve judicial resources by allowing the common issues of the Class members and to Renters Subclass members to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.

78.     It appears that other persons who fall within the Class definition set forth above and the Renters Subclass set forth above are not pursuing similar litigation, such that individual Class members and Subclass members do not wish to control the prosecution of separate actions.

79.     This proposed class action does not present any unique management difficulties.

80.     Also, certification of the Class and Renters Subclass under Rule 23(B)(2) for purposes of declaratory and injunctive relief is proper.  Nicor has acted on grounds

that apply generally to the Class and to the Renters Subclass, so that final injunctive and corresponding declaratory relief, along with appropriate equitable relief, is appropriate with respect to the class as a whole.  Specifically, Nicor's scheme to deceive and otherwise engage in unlawful business practices relative to consumers is common to the Class and Renters Subclass.  The Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.09(d), specifically authorizes consumers to obtain "a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter." Similarly, the Ohio Telephone Solicitation Sales Act, Ohio Rev. Code § 4719.15(A) authorizes purchasers to obtain "an injunction, a temporary restraining order, or other appropriate relief" to remedy the violation.  Furthermore, under the common law, Plaintiffs and Class and Renters Subclass members also can obtain an injunction, a declaration of rights, and rescission as equitable remedy.

<u>**COUNT I**</u>
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**

1.      Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth below.

2.      The Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 *et seq.* ("OCSPA") provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. §1345.02(A).

3.      Nicor is a "supplier" as defined in the OCSPA because it is a seller or other person who regularly engages in or solicits consumer transactions, which includes the sale of services to individuals that are primarily for a personal, familial, or household purpose. R.C. § 1345.01(A), (C).

4.      The OCSPA provides that "an unfair or deceptive act or practice by a supplier violates [the OCSPA] whether it occurs before, during, or after the transaction." R.C. § 1345.02(A).

5.      Plaintiffs and the Class members are "consumers," which is defined as persons who engage in consumer transactions with a supplier. R.C. § 1345.02(D).

6.      The OCSPA further provides that:

[w]ithout limiting the scope . . ., the act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

(2) That the subject of a consumer transaction is of a particular standard, quality, trade, style, prescription, or model, if it is not;
. . .

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

R.C. § 1345.02.

7.     Nicor committed unfair or deceptive acts, including but not limited to:

   a.   Representing that its purported protection plans had sponsorship, approval, performance characteristics, accessories, uses, or benefits those plans did not have which Nicor knew or should reasonably have known they did not have;

   b.   Representing that its purported protection plans were of a particular standard, quality, trade, style, prescription, or model, when they were not and when Nicor knew or should reasonably have known that they were not.

   c.   Representing that Nicor had a sponsorship, approval, or affiliation that it does not have and when Nicor knew or reasonably should have known that it did not have.

8.     The OCSPA further provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, curing, or after the transaction." R.C. § 1345.03(A).

9.     In determining unconscionability, the OCSPA requires the following circumstances to be taken into consideration:

   (3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the customer to receive a substantial benefit from the subject of the consumer transaction;

   . . .

   (5)  Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

   (6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

R.C. § 1345.03.

10. As detailed below, violations of the Ohio Telephone Solicitations Act also violate the OCSPA.

11. Under R.C. § 1345.09, Nicor was on notice in at least three adequate and independent ways that its conduct violates the OCSPA: (1) under Ohio Administrative Code Rule 109:4-3-11; (2) the Sixth Circuit's decision in *Charvat v. NMP, LLC*; and (3) the Ohio Court of Appeals decision in *Swiger v. Terminix Int'l Co., LLP*.

12. *Ohio Admin. Code Rule 109:4-3-11*. The OCSPA applies "[w]here the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based." R.C. § 1345.09. Under §1335.05(B)(2), the Attorney General may "[a]dopt, amend, and repeal substantive rules defining with reasonable specificity acts or practices that violate sections 1345.02, 1345.03, and 1345.031 of the Revised Code." R.C. § 1345.05.

13. Ohio Admin. Code 109:4-3-11 was a rule promulgated by the Attorney General under R.C. § 1345.09. That regulation provides that:

(A) It shall be a deceptive act or practice in connection with a consumer transaction involving any direct solicitation sale for a supplier to do any of the following:

(1) Solicit a sale without clearly, affirmatively, and expressly revealing at the time the supplier initially contacts the consumer or prospective consumer, and before making any other statement, asking any question, or entering the residence of the consumer or prospective consumer, that the purpose of the contact is to effect a sale, stating in general terms the goods or services the supplier has to offer, provided that this paragraph shall not apply to solicitations by mail;

. . .

(8) Send a consumer a communication that the supplier proposes to . . . provide services for, the consumer, which communication, goods or services the consumer has not expressly agreed in advance to receive, and

21

the consumer will be required to pay for those . . . services unless the consumer communicates a refusal of the offered goods or services;

. . .

(10) Send unordered goods to, or perform unordered services for, a consumer and then request payment for the provided goods or services . . . .

(B) "Direct solicitation" means solicitation of a consumer transaction initiated by a supplier, at the residence of any consumer, or at a place other than the normal place of business of the supplier or by a supplier who has no normal place of business, and includes a transaction initiated by the supplier by mail or telephone solicitation at the residence of any consumer or at a place other than the normal place of business of the supplier.

14.     *The Charvat Decision.*  The Sixth Circuit has affirmed that violating Ohio Admin. Code 109:4-3-11 creates a violation of the OCSPA.  In *Charvat v. NMP, LLC*, a consumer sued a company that made unsolicited telemarketing calls, two of which were made by a live agent, and the rest of which were prerecorded.  *Charvat v. NMP, LLC*, 656 F.3d 440, 442 (6th Cir. 2011).  The Sixth Circuit held that the plaintiff had stated a claim against the defendant under the OCSPA for violating Ohio Admin. Code 109-3-11:

Charvat also alleges in Count Eleven that Defendants failed to state at the beginning of each call that the purpose of the call was to make a sale, in violation of O.A.C. § 109:4–3–11(A)(1) and/or 16 C.F.R. § 310.4(d)(2). Charvat includes in his complaint decisions in which Ohio courts have found that violations of these regulations are unfair or deceptive practices under the OCSPA. *See* R.20 (2d Am. Compl. ¶ 78 n.3) (citing *Ohio ex rel. Fisher v. Wykle,* No. 90–1395, at 4 (Ohio Ct. C.P. Apr. 8, 1992) (PIF No. 1141); *Ohio ex rel. Petro v. Craftmatic Org., Inc.,* No. 05–CVH–06–06060, at 13 (Ohio Ct. C.P. July 25, 2005) (PIF No. 2347)); *Burdge v. Satellite Sys. Network, LLC,* No. 2005 CV F 00243, at 2 (Fairfield, Ohio Mun. Ct. May 11, 2005) (PIF No. 2344). We therefore reject Defendants' argument that Charvat's pleadings with respect to Counts Five, Six, Nine, Ten, and Eleven are deficient under *Culbreath.*

*Charvat*, 656 F.3d 440, 451. *Charvat* is available for review in the Attorney General's Online Public Inspection File, http://opif.ohioattorneygeneral.gov/ opifimages/PIF%202902.pdf.

15.     By violating Ohio Admin. Code 109:4-3-11, Nicor engaged in deceptive conduct under the OCSPA, and thereby violated the OCSPA.

16.     Given the express language of Ohio Admin. Code 109:4-3-11, Nicor was on notice that its acts and practices violated the OCSPA.

17.     Even if Ohio Admin. Code 109:4-3-11 alone did not put Nicor on notice that its actions were unlawful – which it did – the *Charvat* decision put Nicor on notice that its conduct violated the OCSPA.

18.     Under R.C. § 1345.09, Nicor was also on notice that its conduct violates the OCSPA by an Ohio State Court opinion. The OCSPA applies to "an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection…" R.C. § 1345.09.

19.     *The Swiger Decision.*   The Court of Appeals of Ohio has stated that nondisclosure of corporate connections violates the OCSPA.  In *Swiger v. Terminix Int'l Co. L.P,* consumers sued a termite company, Terminix, which inspected the consumers' house without disclosing that it was affiliated with the termite company that had previously treated the house. *Swiger v. Terminix Int'l Co. L.P.*, 1995 WL 396467, at *1 (Ohio Ct. App. June 28, 1995). The court held that the plaintiffs stated a claim against the defendant under the OCSPA for violating R.C. § 1345.02(A):

> under certain circumstances, the failure to disclose a corporate connection to a consumer may constitute an unfair or deceptive act or practice in violation of R.C. 1345.02(A), if such nondisclosure causes or is likely to cause substantial injury to the consumer, the injury is not reasonably avoidable by the consumer, and the injury is not outweighed by countervailing benefits to consumers as a whole or to competition.

*Swiger v. Terminix Int'l Co. L.P.,* 1995 WL 396467, at *6 (Ohio Ct. App. June 28, 1995). *Swiger* is available for review in the Attorney General's Online Public Inspection File, http://opif.ohioattorneygeneral.gov/Case/Detail/1316.

20.     By violating R.C. § 1345.02(A), Nicor engaged in deceptive conduct under the OCSPA, and thereby violated the OCSPA.

21.     Given the clear language of R.C. § 1345.02(A), Nicor was on notice that its acts and practices violated the OCSPA.

22.     Even if R.C. § 1345.02(A) alone did not put Nicor on notice that its actions were unlawful – which it did – the *Swiger* decision put Nicor on notice that its conduct violated the OCSPA.

23.     As a direct and proximate result of Nicor's OCSPA violations, Plaintiffs and Class members have been injured and suffered actual damages.

24.     Plaintiffs and Class members are entitled to actual damages, statutory damages, and restitution.

25.     Under Ohio Rev. Code § 1345.09(D), Plaintiffs and Class Members are entitled to a declaratory judgment, an injunction, and any other appropriate relief.

26.     This Court, when applying Ohio law, should permit a class action, under Ohio Rule of Civil Procedure 23, for statutory damages under OCSPA.

27.     Alternatively, the Plaintiffs and Class members are entitled to restitution from Nicor. Restitution measures the remedy by the Defendant's gain and seeks to force disgorgement of that gain. It differs from damages, which measures the remedy by the Plaintiffs' loss.

28.     Plaintiffs and the Class members are entitled to statutory damages and/or restitution in the form of the disgorgement of Nicor's net profits on its unfair, deceptive, and unconscionable sale of its purported protection plans.

**COUNT II**
**ADDITIONAL VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**

**(PLAINTIFF SCHROEDER AND RENTERS SUBCLASS ONLY)**

29.     Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth below.

30.     Under the OCSPA, "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. §1345.02(A).

31.     Nicor is a "supplier" as defined in the OCSPA because it is a seller or other person who regularly engages in or solicits consumer transactions, which includes the sale of services to individuals that are primarily for a personal, familial, or household purpose. R.C. § 1345.01(A), (C).

32.     Plaintiff Schroeder and the Subclass members are "consumers," which is defined as persons who engage in consumer transactions with a supplier. R.C. § 1345.02(D).

33.     The OCSPA provides that "an unfair or deceptive act or practice by a supplier violates [the OCSPA] whether it occurs before, during, or after the transaction." R.C. § 1345.02(A).

34.     The OCSPA provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. § 1345.03(A).

35.     In determining unconscionability, the OCSPA requires the following circumstance to be taken into consideration:

> (3)  Whether the supplier knew at the time the consumer transaction was entered into of the inability of the customer to receive a substantial benefit from the subject of the consumer transaction;
>
> . . .
>
> (5)  Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;
>
> (6)  Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

36.     Nicor marketed and sold its "homeowner" repair plans to renters as well as homeowners.  These plans, which purport to be contracts between Nicor and the renter, provide little to no enforceable coverage whatsoever for renters.  Thus, not only were the plans largely worthless to begin with for the reasons stated elsewhere herein, they provided even less coverage – if any – to renters.

37.     At the time that Nicor entered into its coverage plans with renters, it knew of the inability of renters (including Plaintiff Schroeder and Renters Subclass members) to receive a substantial benefit – or perhaps any benefit at all – from the plans.

38.     Nicor also knew that, relative to renters, the plans were substantially one-sided in Nicor's favor because they afforded renters little to no coverage at all.  The plans also essentially give Nicor the unlimited right to determine the nature and extent of its performance relative to renters.

39.     Under R.C. § 1345.09, Nicor was on notice that its conduct violates the OCSPA. The OCSPA applies to "an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection…" R.C. § 1345.09.

40.     An Ohio state court has recognized that when a supplier takes advantage of a consumer's ignorance to understand the language of an agreement, or knowingly enters into a transaction with a consumer who cannot receive a substantial benefit, it is an unconscionable act which violates the OCSPA. *Brown v. Lyons*, 332 N.E.2d 380, 386 (Com. Pl. 1974). In *Brown v. Lyons*, consumers sued a business which sold used appliances. Many of the appliances did not work, and when consumers complained, the appliances were improperly repaired. The court held that the plaintiffs stated a claim against the defendant under the OCSPA for violating R.C. § 1345.03(A):

> Where a supplier in connection with a consumer transaction knowingly takes advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement, the supplier commits an unconscionable act and practice in violation of the Ohio Consumer Sales Practices Act, R.C. 1345.03(A).

> Where a supplier in connection with a consumer transaction knows at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction, the supplier commits an unconscionable act and practice in violation of the Ohio Consumer Sales Practices Act, R.C. 1345.03(A).

> Where a supplier in connection with a consumer transaction knowingly makes a misleading statement of opinion on which the consumer is likely to rely to his detriment, [sic] the supplier commits an unconscionable act or practice in violation of the Ohio Consumer Sales Practices Act, R.C. 1345.03(A).

*Brown v. Lyons*, 332 N.E.2d 380, 386 (Com. Pl. 1974). *Brown* is available for review in the Attorney General's Online Public Inspection File, http://opif.ohioattorneygeneral.gov/opifimages/PIF304.pdf

41.     By violating R.C. § 1345.03(A), Nicor engaged in unconscionable conduct under the OCSPA, and thereby violated the OCSPA.

42.     Given the clear language of R.C. § 1345.03(A), Nicor was on notice that its acts and practices violated the OCSPA.

43.     Even if R.C. § 1345.03(A) alone did not put Nicor on notice that its actions were unlawful – which it did – the *Brown* decision put Nicor on notice that its conduct violated the OCSPA.

44.     As a direct and proximate result of Nicor's OCSPA violations, Plaintiff Schroeder and Renters Subclass members have been injured and suffered actual damages.

45.     Plaintiff Schroeder and Renters Subclass members are entitled to actual damages, statutory damages, and restitution.

46.     Under Ohio Rev. Code § 1345.09(D), Plaintiffs and Subclass Members are entitled to a declaratory judgment, an injunction, and any other appropriate relief.

47.     This Court, when applying Ohio law, should permit a class action, under Ohio Rule of Civil Procedure 23, for statutory damages under the OCSPA.

48.     Alternatively, the Plaintiff Schroeder and Renters Subclass members are entitled to restitution from Nicor. Restitution measures the remedy by the Defendant's gain and seeks to force disgorgement of that gain. It differs from damages, which measures the remedy by the plaintiffs' loss.

49.     Plaintiff Schroeder and the Renters Subclass members are entitled to statutory damages and/or restitution in the form of the disgorgement of Nicor's net profits on its unfair, deceptive, and unconscionable sale of its purported protection plans.

## COUNT III
## VIOLATION OF THE OHIO TELEPHONE SOLICITATION SALES ACT

50.     Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth below.

51.     The purpose of the Ohio Telephone Solicitation Sales Act (the "OTSSA") is "to protect purchasers from telephone solicitors and salespersons that commit unfair, unlawful,

28

deceptive, or unconscionable acts or practices and to encourage the development of reasonable and fair telephone solicitations sales practices." R.C. § 4719.18(A).

52.     The OTSSA's provisions "are remedial in nature and shall be liberally construed." R.C. § 4719.18(B).

53.     Nicor is a "telephone solicitor" under the OTSSA because it engages in telephone solicitations directly or through one or more salespersons from a location outside Ohio to persons in Ohio. R.C. § 4719.01(A)(7), (8).

54.     Plaintiffs and Class members are "purchasers" under the OTSSA because they were solicited to become and did become financially obligated as a result of Nicor's telephone solicitation. R.C. § 4719.01(A)(5).

55.     The OTSSA provides that "[w]ithin the first sixty seconds of a telephone call, and before requesting any financial information or conveying to the consumer any substantive information about a . . . service, no telephone solicitor or salesperson shall fail to do all of the following:

> (1) State the solicitor's or salesperson's true name and the company on whose behalf the solicitation is being made;

> (2) State the purpose of the telephone call is to effect a sale;

> (3) Identify the goods or services being sold.

R.C. § 4719.06(A). A violation of this provision is "an unfair or deceptive act or practice in violation of [the OCSPA]." R.C. § 4719.14.

56.     The OTSSA also provides that "[i]f a sale or an agreement to purchase is completed during a telephone call, no telephone solicitor or salesperson, before requesting payment, shall fail to . . . disclose all of the following information in a clear and conspicuous manner:

(1) The street address and telephone number of the telephone solicitor;

(2) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the telephone solicitation;

(3) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the telephone solicitation;

(4) All material terms and conditions of the telephone solicitor's policy of making refunds, cancellations, exchanges, or repurchases . . . .

R.C. § 4719.06(B). The telephone solicitor or salesperson must make these oral disclosures "in a clear and intelligible manner." R.C. § 4719.06(C). A violation of this provision is "an unfair or deceptive act or practice in violation of [the OCSPA]." R.C. § 4719.14.

57.      The OTSSA provides that "[n]o verbal agreement, made by a purchaser as a result of a telephone solicitation, to purchase goods or services from a telephone solicitor is valid or legally binding unless the telephone solicitor receives from the purchaser a signed, written confirmation that compiles with" various provision of the OTSSA. R.C. § 4719.07(A). The purchaser is not liable for payment of the services and the telephone solicitor cannot charge the purchaser until that signed, written confirmation is obtained. R.C. § 4719.07(B), (C).

58.      The OTSSA provides that "[n]o telephone solicitor shall . . . [m]isrepresent, directly or by implication, any of the following information: . . . (3) [a] material aspect of the performance, efficacy, nature or characteristics of goods or services that are the subject of a telephone solicitation; . . . (7) [t]he telephone solicitor's affiliation with, or endorsement by, any government or third-party organization." R.C. § 4719.08(F). A violation of this provision is "an unfair or deceptive act or practice in violation of [the OCSPA]." R.C. § 4719.14.

59.      The OTSSA also prohibits a telephone solicitor from making "a false or misleading statement to induce a purchaser to pay for goods or services." R.C. § 4719.08(G). A

violation of this provision is "an unfair or deceptive act or practice in violation of [the OCSPA]." R.C. § 4719.14.

60. The OTSSA requires telephone solicitors to register with the Attorney General's office and to provide various information with that registration. R.C. § 4719.02.

61. A seller violates the OTSSA and commits "an unfair or deceptive act or practice in violation of [the OCSPA]" if the seller fails to register with the Attorney General. R.C. § 4719.14.

62. "A purchaser injured by a violation of [the OTSSA] . . . may bring a civil action against the telephone solicitor or salesperson who committed the violation for damages in a court of common pleas and may apply to the court for an order enjoining the violation." R.C. § 4719.15(A).

63. Damages awarded under the OTSSA shall be "in an amount that is not less than the amount the purchaser paid to the telephone solicitor or salesperson and shall order the telephone solicitor or salesperson to pay reasonable attorney's fees and court costs to the purchaser." R.C. § 4719.15(B).

64. The court may also award "punitive or exemplary damages" against a telephone solicitor or salesperson that knowingly committed an act or practice that violated the OTSSA. R.C. § 4719.15(C).

65. Nicor failed to register under the OTSSA, http://www.ohioattorneygeneral.gov/Individuals-and-Families/Consumers/ Telephone-Solicitors, and knowingly violated the OTSSA by failing to make the required disclosures in the first minute of the telephone solicitation; by failing to make clear and intelligible disclosures before requesting payment on the telephone solicitation; by failing to obtained the required signed,

written confirmation from Plaintiffs and Class members; by misrepresenting a material aspect of the performance, efficacy, nature or characteristics of its protection plans; by misrepresenting Nicor's affiliation with, or endorsement by, any government or third-party organization; and by making misleading statements to induce Plaintiffs and Class members to "agree" to the protection plans.

66.     Plaintiffs and Class members were injured by Nicor's violations of the OTSSA and seek recovery of the amount paid to Nicor, punitive or exemplary damages, declaratory and injunctive relief under Ohio Rev. Code § 4719.15(A), and attorney's fees and costs.

**COUNT IV**
**VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**

67.     Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth below.

68.     Ohio's Deceptive Trade Practices Act ("ODTPA") provides that "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

(1)  Passes off goods or services as those of another;

(2)  Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)  Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4)  Uses deceptive representations or designations of geographic origin in connection with goods or services;

. . .

(7)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

. . .

(9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

R.C. § 4165.02(A).

69.    Nicor violates the ODTPA by:

    a.   Passing off its repair plans as those of Vectren, a public utility;

    b.   Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of its repair plans;

    c.   Causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, Vectren, a public utility;

    d.   Using deceptive representations or designations of geographic origin in connection with its repair plans;

    e.   Representing that its repair plans have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that Nicor has a sponsorship, approval, status, affiliation, or connection that it does not have; and

    f.   Representing that its services are of a particular standard, quality, or grade, or that goods are of a particular style or model, that they are not.

70.    The ODTPA provides that "[a] person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action to recover actual damages from the person who commits the deceptive trade practice." R.C. § 4165.03(A)(2).

71.    The ODTPA also provides that the Court may award reasonable attorney's fees against a defendant if the Court finds that the defendant has willfully engaged in a trade practice that violates the ODTPA knowing it to be deceptive.

72.    Plaintiffs and Class members were injured by Nicor's deceptive trade practices and requests damages and attorneys' fees.

## COUNT V
## MONEY HAD AND RECEIVED / UNJUST ENRICHMENT

73.     Plaintiffs incorporate each preceding paragraph of this Complaint as if fully set forth below.

74.     Nicor has requested, received, and retained funds from the Plaintiffs and Class members under such circumstances that in equity and good conscience Nicor ought not to retain those funds.

75.     Nicor should be required to pay or otherwise disgorge the improperly received and retained funds to the Plaintiffs and Class members.

## COUNT VI
## RESCISSION
## (PLAINTIFF SCHROEDER AND RENTERS SUBCLASS ONLY)

76.     Plaintiffs incorporate each preceding paragraph of this Complaint as if fully set forth below.

77.     Nicor marketed and sold its "homeowner" repair plans to renters as well as homeowners.  These plans, which purport to be contracts between Nicor and the renter, provide no enforceable coverage whatsoever for renters.

78.     Relative to renters, the plans therefore provide no benefit to renters and/or give Nicor the unlimited right to determine the nature and extent of its performance.  Nicor's plans are therefore illusory and subject to rescission.

79.     Furthermore, Nicor's plans are also subject to rescission because they are unconscionable.  In addition to the grounds for unconscionability established relative to the Ohio Consumer Practices Act and other allegations set forth above, the contract is both procedurally and substantive unconscionable.   Consumers had no reasonable choice concerning the terms of

the "take it or leave it" contract, and the contract terms were unreasonably favorable to Nicor – essentially amounting to money for nothing. The plans were not commercially reasonable for the reasons stated above. The plans are therefore subject to rescission on this basis as well.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs, on behalf of themselves and the proposed Class and the proposed Renters Subclass, respectfully request:

A.      Certification of the Class requested above under both Rule 23(B)(3) and Rule 23(B)(2) and appointment of the Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Certification of the Renters Subclass requested above under Rules 23(B)(3) and Rule 23(B)(2) and appointment of Plaintiff Schroeder as Renters Subclass Representative and her counsel as Class Counsel for the Renters Subclass;

C.      An award of actual and statutory damages to the Plaintiffs and Class and Renters Subclass members;

D.      An award of restitution to, disgorgement to, and/or other appropriate equitable relief in favor of the Plaintiffs and Class and Renters Subclass members;

E.      Relative to Plaintiff Schroeder and Renters Subclass Members, rescission of the plans and other appropriate equitable relief, including but limited to restitution or disgorgement of money obtained by Nicor from Renters Subclass Members;

F.      Declaratory and injunctive relief, including but not limited to a temporary, preliminary, or permanent injunction prohibiting ongoing unlawful conduct by the Defendant;

G.      An award of costs, attorneys' fees, and expenses as permitted by law;

H.     The entry of judgment against Nicor and in favor of the Plaintiffs, the Class, and

the Renters Subclass in the amount of the relief requested herein; and

I.     All other relief that the Court finds just and proper.

**JURY DEMAND**

Plaintiffs, by counsel, demand trial by jury.

Dated: April 6, 2018                      Respectfully submitted,


                                          /s/ Alyson Steele Beridon
                                          Alyson Steele Beridon (0087496)
                                          Attorney for Plaintiffs and Proposed Class
                                          BRANSTETTER, STRANCH &
                                          JENNINGS, PLLC
                                          3142 Losantville Ave., Suite A
                                          Cincinnati, OH 45213
                                          Phone: (513) 381-2224
                                          alysonb@bsjfirm.com

                                          J. Gerard Stranch, IV (TN BPR#23045)
                                          Anthony A. Orlandi (TN BPR # 33988)
                                          Attorneys for Plaintiffs and Proposed Class
                                          BRANSTETTER, STRANCH &
                                          JENNINGS, PLLC
                                          223 Rosa L Parks Avenue, Suite 200
                                          Nashville, TN 37203
                                          Phone: (615) 254-8801
                                          Fax: (615) 255-5419
                                          gerards@bsjfirm.com
                                          aorlandi@bsjfirm.com

                                          Irwin B. Levin (Indiana Bar # 8786-49)
                                          Richard E. Shevitz (Indiana Bar # 12007-49)
                                          Vess A. Miller (Indiana Bar # 26495-53)
                                          Lynn A. Toops (Indiana Bar # 26386-49)
                                          Attorneys for Plaintiffs and Proposed Class
                                          COHEN & MALAD, LLP
                                          One Indiana Square, Suite 1400
                                          Indianapolis, IN 46204
                                          Telephone: (317) 636-6481
                                          Fax: (317) 636-2593
                                          ilevin@cohenandmalad.com
                                          rshevitz@cohenandmalad.com
                                          vmiller@cohenandmalad.com
                                          ltoops@cohenandmalad.com